Herbert F. Lessmann and Mildred Lessmann v. Commissioner. Herbert F. Lessmann v. Commissioner.Lessmann v. CommissionerDocket Nos. 79803, 79807.United States Tax CourtT.C. Memo 1962-253; 1962 Tax Ct. Memo LEXIS 53; 21 T.C.M. (CCH) 1339; T.C.M. (RIA) 62253; October 30, 1962Ennis McCall, Esq., and Lewis M. Girdner, Esq., for the petitioners. Joseph D. Skinner, Esq., and William J. McNamara, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax and additions to tax as follows: Docket No. 79807 - Herbert F. LessmannAdditions to Tax - I.R.C. of 1939 1Taxable YearsIncome Tax§ 294(d)EndedDeficiency§ 293(b)(1)(A)§ 294(d)(2)Jan. 31, 1945$29,685.84$14,842.92$1,797.98Jan. 31, 194627,226.1513,613.08$2,495.451,615.62Jan. 31, 194712,486.076,243.04701.16Jan. 31, 194813,895.696,947.851,178.64785.75*54 Docket No. 79803 - Herbert F. Lessmann and Mildred LessmannAdditions to tax - I.R.C. of 1939Taxable YearsIncome Tax§ 294(d)§ 294(d)EndedDeficiency§ 293(b)(1)(A)(1)(B)§ 294(d)(2)Jan. 31, 1949$ 2,388.64$1,194.32$ 143.31Jan. 31, 19526,525.823,262.91$72.00338.69Jan. 31, 195318,776.968,988.48$1,908.78972.51Jan. 31, 19542,882.101,441.051,550.521,033.68 By an amendment to his answer in Docket No. 79807 the respondent claimed an increased deficiency in income tax and additions to tax under sections 293(b), 294(d)(1)(A) and 294(d)(2) for the taxable year ending January 31, 1946 in the respective amounts of $30,254.51, $15,127.26, $2,768 and $1,797.33. By an amendment to his answer in Docket No. 79803 the respondent claimed an increased deficiency in income tax and additions to tax under sections 293(b) and 294(d)(2) for the taxable year ending January 31, 1952 in the respective amounts of $7,068.15, $3,534.08 and $371.23. The issues in these consolidated cases are*55 (1) whether petitioners understated their business income and also failed to report certain other items of income during the taxable years here involved; (2) whether petitioners overstated certain deductions claimed on their returns during the years here involved; (3) whether a part of any deficiency for any of the taxable years here involved was due to fraud with intent to evade tax; (4) whether petitioners are liable for certain additions to tax claimed by respondent for the taxable years involved; and (5) whether any of the taxable years here involved is barred by the statute of limitations. Findings of Fact Herbert F. Lessmann and Mildred Lessmann, husband and wife, are residents of Des Moines, Iowa. Herbert F. Lessmann, hereinafter called petitioner, filed an individual income tax return for the taxable years ended January 31, 1945, 1946, 1947 and 1948 with the then collector of internal revenue at Des Moines, Iowa, and he filed joint returns with his wife for the taxable years ended January 31, 1949, 1952, 1953 and 1954 with the then collector and/or district director of internal revenue at Des Moines, Iowa. Such books or records as were maintained by petitioner during*56 the years here involved were closed as of January 31 of each year. Petitioner's returns for these years were filed on the basis of a fiscal year ending January 31. Petitioner was on an accrual method of accounting. Petitioner, who was 72 years old at the time of trial, had a high school education and later studied mechanical engineering briefly at State Normal College, Wayne, Nebraska. In 1918 petitioner moved to Des Moines, Iowa, and started to manufacture a mechanical power loader, which he had previously developed. At that time the unit was attached to tractors. In 1927 he sold the loader manufacturing business for $160,000, but the purchaser went out of business and defaulted on the purchase price. In 1934 petitioner again started to manufacture loaders and continued to experiment with the unit. During this period he had two or three employees. Petitioner's loader manufacturing business has at all times here relevant been conducted under the name of Lessmann Manufacturing Company (hereinafter sometimes called the Company), a sole proprietorship. From prior to 1944 to early in 1947 petitioner purchased Oliver tractors and installed the loaders to the tractors as permanent attachments. *57 Early in 1947 petitioner began to assemble the complete unit, tractor as well as loader, purchasing the component parts of the tractor elsewhere. At times petitioner would sell a loader without selling a tractor, and a few times he would sell a tractor without the loader. Throughout the period here involved petitioner also sold replacement parts for his product. Petitioner had from 16 to 30 employees during the years here involved. During World War II petitioner was able to obtain materials through the system of priorities. Petitioner sold his products both through distributors and directly to the purchaser. The approximate commission allowed to distributors on sales was 22 percent of the gross sales price. On sales made through distributors the sales invoice showed the gross sales price, less the commission, and the net sales price. The distributor would remit the net sales price to the petitioner. On occasion a distributor's commission would be remitted to him by the petitioner by check. During the years 1944 to 1952 the petitioner did not use any established distributors for sales to customers within the State of Iowa or for sales to various stockyards both within and outside*58 the State. Such sales were handled by the petitioner. No discounts were allowed or commissions paid on the stockyards sales and the gross sales price was remitted to petitioner by these stockyard customers. During the years here involved petitioner had two office employees. Lela Swindler, who was an office employee from April 1944 to December 1, 1952 and who handled the bookkeeping, was initially instructed by petitioner's wife on the method of keeping records. From 1944 until late in 1951 the only permanent bookkeeping record maintained for the Company was a check register. During this period there was no sales journal, cash journal, or general ledger. A file folder was kept for sales invoices and for invoices covering sales of replacement parts. The file did not show the amount or cost of the particular shipment. A notebook record of machines and loaders shipped during the period February 1, 1944 to January 31, 1952 was also kept for the Company, but this record did not show the sales prices. After 1951 a complete set of books was maintained. The business bank accounts for the Company were at the Central National Bank and Trust Company (hereinafter sometimes called the Central*59 National Bank) and the Iowa State Bank, both in Des Moines, Iowa. When the petitioner borrowed money from the Central National Bank he pledged as collateral invoices covering machines which had been shipped to customers. Petitioner also signed notes for periods ranging from 30 to 90 days. The bank usually loaned 80 percent of the amount of the pledged invoices. When petitioner received a customer's check in payment for a financed machine, the note and interest would be paid and the difference only would be deposited in the Company bank account. In those instances where petitioner did not borrow money against the sale of a machine, the customers' checks in payment would be turned over to petitioner, who decided which of the checks would be deposited. The same procedure was followed with checks from sales of replacement parts. During the years here involved petitioner purchased cashier's checks at both the Central National Bank and the Iowa State Bank with business receipts which had not been deposited previously in the Company bank accounts. A summary of petitioner's purchases of cashier's checks and bank drafts in the fiscal years ended January 31, 1945 through 1953 follows: PurchasedRedeemedSource of FundsFiscalUnde-YearBankpositedEndedNumberAmountAccountReceiptsNumber1-31-453$ 2,870.00$ 2,870.00None1-31-462235,165.8935,165.89141-31-471330,515.3930,515.39101-31-4834,212.034,212.0381-31-492984,654.89$13,662.4270,992.47371-31-50830,448.7730,448.7781-31-5111,000.001,000.0011-31-52NoneNone1-31-53None1*60 RedeemedDispositionFiscalYearDe-Not De-BalanceEndedAmountposited *positedon Hand1-31-45$ 2,870.001-31-46$ 14,622.00$ 9,722.00$4,900.0023,413.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,614.8214,614.82None39,314.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,481.6817,181.682,300.0024,044.811-31-49106,131.7098,931.707,200.002,568.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,002.7712,786.933,215.8417,014.001-31-511,000.001,000.0017,014.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,014.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,014.0017,014.000At various times during the years here involved the petitioner paid personal bills for oil, electricity, telephone and labor done at his residence and the amounts of these checks, which were drawn on the Company account, were charged to Company expenditures. In 1943 petitioner purchased a cottage at Lake Okoboji in Iowa for $4,200 and in 1944 paid $1,700 for an adjoining cottage. In 1945 or 1946 petitioner purchased a used speed boat for $1,250 and ultimately sold it for $1,000. In 1947 he purchased a Chris-Craft boat for $3,808.02. Petitioner owned two cars during most*61 of the periods here involved. Petitioner's income tax returns for the fiscal years ended January 31, 1945, 1946, 1947, 1948, 1953 and 1954 were prepared by Francis J. Harrigan, a certified public accountant. Petitioner's returns for the fiscal years ended January 31, 1949 and 1950 were prepared by another certified public accountant of the same firm. Petitioner's return for the fiscal year ended January 31, 1951 was prepared by a staff accountant of a large accounting firm; his return for the fiscal year ended January 31, 1952 was signed as prepared by a Nona McFall. In each of the fiscal years ended January 31, 1945 through 1950 the petitioner supplied the accountants who prepared the returns with sales and inventory figures for the respective years. These sales figures were not verified by audit. The sales amounts were prepared under petitioner's instructions showing the customers' names, model numbers of products, date sold, list price or amounts received, and commissions paid. For the fiscal years ended January 31, 1945 through 1950 the accountants computed the deductions for the Company by examining the check register kept for the Company. The list of Company sales for the*62 fiscal year ended January 31, 1945 submitted to Harrigan included the sales in January 1944, and the total gross sales for the 13-month period was $194,593.55. Harrigan used these figures to compute a net profit from operations of $52,907.79. Petitioner and his bookkeeper then informed Harrigan that the closing inventory should be reduced by $20,525 and that an additional deduction for purported commissions or discounts should be taken in the amount of $19,376.25. Of this amount $3,475 was related to sales to various stockyards, and this was in addition to commissions or discounts of about $4,300 already deducted in connection with those same sales. There were no actual commissions or discounts allowed on these stockyard sales and petitioner received payments in full from the various stockyards in the fiscal year 1944. Harrigan also eliminated the sales ($10,790) for January 1944. With these changes and other minor adjustments the net income from operations figure was reduced to $5,651.34, which amount was reported in petitioner's income tax return for that fiscal year. In addition to the above, the list of sales for the fiscal year 1945 given to Harrigan showed a sale of a machine*63 to a stockyard in Fort Worth, Texas at a list price of $2,810 and a commission of $618.20. The Fort Worth stockyard actually paid petitioner $2,753.80 for the machine, the difference being a discount allowed by petitioner on the sale. The list of machine sales for the fiscal year ended January 31, 1946 given to the accountant (Harrigan) did not include the following sales of tractors and loaders which were recorded in the notebook record of sales kept by the petitioner: Dateof SalePurchaser2/21/45Petaluma Fertilizer Company3/ 2/45Jack Morris3/17/45Dolliver Lindgreen5/ 7/45Joe Howell5/21/45St. Genevieve Machine Shop6/20/45C. B. Thomas7/ 3/45Walter Klinger8/24/45Dr. Hansel9/ 4/45Petaluma Fertilizer Company9/14/45United Minerals Products10/ 6/45Meiter's Garage10/16/45K. E. Middour11/ 1/45Douds Quarried, Inc.11/19/45Fred E. Lord1/16/46Des Moines Railway Company Petitioner's deposit slips in the fiscal year ended January 31, 1946 show a deposit in the Company bank account at the Central National Bank on March 26, 1945 of a check from the Petaluma Fertilizer Company in the amount of $3,135 and a deposit in*64 that account on May 8, 1945 of a check from Howell Sand & Gravel in the amount of $2,443.75. In connection with the preparation of his income tax returns for the fiscal years ended January 31, 1945, 1946 and 1947 the petitioner did not inform his accountant (Harrigan) about income received by the sale of replacement parts by the Company. In each of the fiscal years ended January 31, 1945 and 1946 the total deposits in petitioner's business bank accounts of the proceeds of replacement parts sales were about $10,000. In the fiscal year ended January 31, 1947 such deposits of replacement parts sales totaled about $22,000. The list of machine sales by the Company submitted to petitioner's accountant for the fiscal year ended January 31, 1948 showed total net sales of $149,762.73. The checks from such sales deposited in the Company bank account at the Central National Bank totaled about $162,000. On April 15, 1949 petitioner shipped five machines to the Clyde Equipment Company and on May 12, 1949 shipped an additional six machines to the same company. On the list of sales for the fiscal year ended January 31, 1950 to the petitioner's accountant, petitioner reported the five machines*65 shipped in April, at a total selling price of $14,213.25, but failed to include the six machines shipped in May. On May 9, 1949 the Clyde Equipment Company issued its check to the Lessmann Manufacturing Company in payment of five machines in the amount of $14,213.25, and on June 2, 1949 the Clyde Equipment Company issued its check to the Lessmann Manufacturing Company in the payment of the remaining six machines in the amount of $17,023.27. On June 27, 1949 the Central National Bank issued a bank draft to Lessmann Manufacturing Company drawn on the Continental Illinois Bank in the amount of $17,014. This draft was paid on December 9, 1952. The $17,014 sale was not reported in petitioner's income tax return for the fiscal year ended January 31, 1950. Petitioner's income tax returns for the fiscal years ended January 31, 1945 through 1952 showed the following net income or (loss): FiscalYear EndedNet IncomeJanuary 31Net Salesor (Loss)1945$129,284.07 *$ 5,651.341946196,222.42 *4,441.47194795,540.83 *(20,577.89)1948173,295.20(15,990.91)1949162,660.66(22,820.17)195078,400.15(43,540.66)195173,439.18(31,924.02)1952198,812.27 **(1,131.57)*66 On or about December 1, 1952 the petitioner sold the business operated under the name Lessmann Manufacturing Company to the United Barrel Company for a sales price of $259,200. Petitioner and his wife maintained bank accounts at the Central National Bank, Iowa State Bank and the First National Bank, (Spirit Lake, Iowa) during the fiscal years ended January 31, 1945 through 1952. Petitioner had an account in the name of Lessmann Manufacturing Company at the Central National Bank throughout this entire period; his wife, Mildred, had a savings account at the same bank during the fiscal years ended January 31, 1947 through 1952. Petitioner also had an account in the name of Lessmann Manufacturing Company at the Iowa State Bank during the fiscal years ended January 31, 1950 through 1952; at the same bank petitioner and his wife had*67 a joint checking account during the fiscal years ended January 31, 1950 and 1951. Throughout the entire period petitioner and his wife had a joint checking account at the First National Bank at Spirit Lake, Iowa. The following schedule shows the gross business receipts of the Lessmann Manufacturing Company (after adjustments made for accounts and notes receivable outstanding at the beginning and end of each fiscal year, which will place the Company receipts on an accrual basis of accounting) as determined under the bank deposits and cash expenditures method, with adjustments for concessions made by respondent at the trial: Fiscal Year Ended1/31/451/31/461/31/47DepositsCentral National Bank & Tr. Co.$164,348.44$235,562.83$135,021.51Iowa State BankFirst National Bank5,300.661,215.0022.00Total bank deposits$169,649.10$236,777.83$135,043.51Less: Non-income depositsNote proceeds$ 91,991.81$137,550.69$ 49,516.92Cashier's checks redeemed14,622.0014,614.82Inter-bank transfers and other items500.002,759.16Total non-income deposits$ 92,491.81$154,931.85$ 64,131.74Net Deposits$ 77,157.29$ 81,845.98$ 70,911.77Add: Receipts not deposited - withheldfrom de-posit slipsPayments of notes payable and interest$ 83,416.75$122,715.69$ 54,782.08Cashier's checks purchased2,870.0035,165.8930,515.39Purchase of auto (cashier's check)Cash and miscellaneous7.064.62Total receipts$163,451.10$239,732.18$156,209.24Adjustment for accounts receivableBeginning of year (deduct)[11,063.25)[20,854.63)[26,586.13)End of year (add)20,854.6326,586.137,926.04Adjusted Total Receipts$173,242.48$245,463.68$137,549.15Sales Receipts (less discounts) - fromincome taxreturns or accountant's working papers129,284.07196,222.4295,540.83Increase in Receipts$ 43,958.41$ 49,241.26$ 42,008.32*68 Fiscal Year Ended1/31/481/31/491/31/50DepositsCentral National Bank & Tr. Co.$249,447.75$226,165.92$115,117.92Iowa State Bank12,207.06First National Bank1,438.3217,697.01479.67Total bank deposits$250,886.07$243,862.93$127,804.65Less: Non-income depositsNote proceeds$130,615.97$ 14,583.52$ 30,638.13Cashier's checks redeemed19,481.68106,131.7016,002.77Inter-bank transfers and other items2,155.185,358.169,616.89Total non-income deposits$152,252.83$126,073.38$ 56,257.79Net Deposits$ 98,633.24$117,789.55$ 71,546.86Add: Receipts not deposited - withheldfrom de-posit slipsPayments of notes payable and interest$ 98,035.32$ 10,397.66$ 7,852.00Cashier's checks purchased4,212.0370,992.4730,448.77Purchase of auto (cashier's check)2,300.00Cash and miscellaneousTotal receipts$203,180.59$199,179.68$109,847.63Adjustment for accounts receivableBeginning of year (deduct)$ (7,926.04)[18,101.45)[16,042.27)End of year (add)18,101.4516,042.2713,403.22Adjusted Total Receipts$213,356.00$197,120.50$107,208.58Sales Receipts (less discounts) - fromincome taxreturns or accountant's working papers173,295.20162,660.6678,400.15Increase in Receipts$ 40,060.80$ 34,459.84$ 28,808.43*69 Fiscal Year Ended1/31/511/31/52DepositsCentral National Bank & Tr. Co.$152,946.33$372,969.94Iowa State Bank11,954.836,052.87First National Bank9,409.233,171.24Total bank deposits$174,310.39$382,194.05Less: Non-income depositsNote proceeds$ 60,412.82$164,236.28Cashier's checks redeemed1,000.00Inter-bank transfers and other items11,101.0810,610.50Total non-income deposits$ 72,513.90$174,846.78Net Deposits$101,746.49$207,347.27Add: Receipts not deposited - withheldfrom de-posit slipsPayments of notes payable and interest$ 3,026.13$ 4,461.45Cashier's checks purchased1,000.00Purchase of auto (cashier's check)Cash and miscellaneous50.00Total receipts$105,872.62$211,808.72Adjustment for accounts receivableBeginning of year (deduct)[13,403.22)$ (8,210.64)End of year (add)8,210.6427,777.65Adjusted Total Receipts$100,680.04$231,375.73Sales Receipts (less discounts) - fromincome taxreturns or accountant's working papers73,439.18198,812.27Increase in Receipts$ 27,240.86$ 32,563.46Respondent in his statutory notice of deficiency added the following*70 amounts (representing increases in business receipts as determined by the bank deposit and cash expenditures method) to petitioner's income for the fiscal years ended January 31, 1945, 1946, 1947, 1948, 1949 and 1952, respectively: $48,693.46, $45,309.64, $47,976.27, $44,879.96, $37,149.19 and $32,563.45. 2 Respondent also disallowed a portion of the deduction claimed by petitioner for the Company as outside labor, with the explanation that these expenses were for domestic help and were therefore personal expenditures. The amounts disallowed in the fiscal years ended January 31, 1945, 1946, 1947, 1948 and 1949 were, respectively: $1,311.95, $2,936.30, $3,791.25, $3,048.76 and $2,040.79. Respondent also disallowed a portion of the deduction claimed in the fiscal year ended January 31, 1949 for taxes in the amount of $439.49. *71 Respondent disallowed a net operating loss deduction of $24,451.42 claimed by petitioner in the fiscal year ended January 31, 1953, disallowed deductions for (1) salary and wages, $2,500, (2) bad debts, $7,813.62 and (3) business expenses, $3,311.51, and also made other minor adjustments. For the fiscal year ended January 31, 1954 the respondent included additional dividend and interest income items in petitioner's income and disallowed expense deductions of $2,619.50 on the ground that they were personal expenses, and a capital gain of $193.79. A part of the deficiency for each of the fiscal years ended January 31, 1945, 1946, 1947, 1948, 1949, 1952 and 1953 was due to fraud with intent to evade tax. Petitioner's returns for the fiscal years ended January 31, 1945, 1946, 1947, 1948 and 1949 were false and fraudulent with intent to evade tax and, therefore, assessment and collection for those years are not barred by the statute of limitations. Opinion Respondent determined the corrected net income of petitioner from the Lessmann Manufacturing Company for the fiscal years ended January 31, 1945, 1946, 1947, 1948, 1949 and 1952 by the bank deposit and cash expenditures method. *72 Respondent was justified in his resort to this method since the petitioner failed to keep proper books and records throughout most of this period which would disclose income with any degree of accuracy. Until late in the year 1951 the only permanent bookkeeping record kept for the operation of the petitioner's loader manufacturing business, operated as a sole proprietorship under the name Lessmann Manufacturing Company, was a check register. There were no sales journals, cash journals or general ledgers, and the lists of sales that were kept in a file folder, identifying the customer and the machinery sold, did not provide any information as to the amounts involved. It is well settled that unexplained bank deposits are evidence of receipt of taxable income. Goe v. Commissioner, 198 F. 2d 851, affirming a Memorandum Opinion of this Court. Here the evidence shows clearly that the deposits in petitioner's bank accounts were predominantly receipts from the sale of loaders and replacement parts by the Lessmann Manufacturing Company. Much of respondent's evidence consisted of records of petitioner's several bank accounts, deposit slips, collateral loan ledgers, cashier's*73 check registers at the banks and other third-party sources. Respondent eliminated from the total deposits the proceeds of loans at the bank, cashier's checks redeemed, inter-bank transfers and other miscellaneous items. Through an analysis of deposit slips and bank records, respondent was able to demonstrate the amounts of receipts which were withheld from deposit and which were used to pay bank loans and to purchase cashier's checks in substantial amounts. These the respondent added to the adjusted total bank deposits in order to arrive at a total receipts figure. Since petitioner was on an accrual method of accounting, respondent made adjustments to the total receipts figures to take into account the outstanding accounts receivable at the end of each fiscal year. This analysis by respondent is quite persuasive and it disclosed total receipts for this period which, when compared with the net sales reported by petitioner, revealed unreported receipts in substantial amounts in each of the fiscal years ended January 31, 1945 through 1952. 3*74 We have included in our findings of fact the schedule showing the increases in receipts as computed under the bank deposit and cash expenditures method. Petitioner's witness, a certified public accountant, expressed general agreement at the trial with the various items which appear in the respondent's computation and could find no fault with them. Nor does petitioner make any serious effort on brief to challenge the items that appear in the schedule. We find correct the additions to petitioner's gross income determined by respondent, with the concessions made at the trial and other adjustments as noted in our findings of fact. To compute the petitioner's corrected net income for the fiscal years ended January 31, 1945, 1946, 1947, 1948, 1949 and 1952 respondent included in gross income the unreported receipts computed under the bank deposits method, which appear in our findings of fact as $43,958.41, $49,241.26, $42,008.32, $40,060.80, $34,459.84 and $32,563.46, respectively. Respondent then allowed all deductions claimed by petitioner on his returns for the years involved with the exception of certain expenditures for labor in each of the fiscal years ended January 31, 1945-1949*75 which respondent disallowed as personal expenditures. Respondent contended these expenditures, in the respective amounts of $1,311.95, $2,936.30, $3,791.25, $3,048.76 and $2,040.79, were paid by petitioner for work done at his home and at his summer cottage. Petitioner offered insufficient evidence to support his claim to these deductions and consequently respondent was correct in disallowing them. 4 Nor did petitioner offer satisfactory proof of deductions in addition to those which were already claimed by him in his returns for these years, or which were conceded by respondent. See United States v. Bender, 218 F. 2d 869. Respondent also made other adjustments in computing net income for all of the fiscal years here involved, including the fiscal years ended January 31, 1953 and 1954, which must be sustained in view of petitioner's failure to either*76 contest them or to introduce evidence to overcome the presumption of correctness which attaches to respondent's determination. We need call attention only to the respondent's disallowance of a net operating loss deduction of $24,451.42 in the fiscal year ended January 31, 1953 which was carried over from prior years. Petitioner reported operating losses on his returns for the fiscal years ended January 31, 1950, 1951 and 1952 in the respective amounts of $43,540.66, $31,924.02 and $1,131.57. However, in recomputing net income for these years respondent added the income determined by him under the bank deposit method, which we have sustained in large part, in the respective amounts of $28,808.43, $27,240.86 and $32,563.46 and as a consequence any operating losses from the fiscal years ending January 31, 1950 and 1951 were used in their entirety in the fiscal year ended January 31, 1952 (in which year respondent allowed a net operating loss deduction of $1,168.18). Respondent was correct in determining petitioner's income for these years on the basis of a fiscal year ended January 31. The sales and expenses figures used in the returns as a basis of computing net income (or loss) listed*77 sales and expenses for a 12-month period ending January 31 and the accountants who prepared the returns testified that the returns were prepared on a fiscal year basis ending January 31. See section 41 of the Internal Revenue Code of 1939. We have also examined the other contentions made by petitioner on brief and find them to be without merit. Respondent determined that a part of the deficiencies for each of the fiscal years ended January 31, 1945 through 1949 and 1952 through 1954 was due to fraud with intent to evade tax. The burden rests upon the respondent to prove fraud by clear and convincing evidence, Arlette Coat Co., 14 T.C. 751. Consistent understatements of income in substantial amounts over a period of years are evidence of fraud. Schwarzkopf v. Commissioner, 246 F. 2d 731. It has also been held that failure to report unexplained bank deposits is evidence of fraud. Russell C. Mauch, 35 B.T.A. 617, affd. 113 F. 2d 555. Here respondent has established that petitioner failed to report substantial amounts of his receipts from his manufacturing operations in each of the fiscal years ending January 31, 1945 through 1949*78 and 1952. The evidence is clear that petitioner was at all times in direct control of the Company's operations. Respondent has introduced other evidence indicative of fraud apart from the repeated omission of substantial receipts from petitioner's returns. In the fiscal year ended January 31, 1945 petitioner submitted information to his accountant which was used by the accountant to compute as net profit from operations in excess of $40,000. Petitioner then reduced his closing inventory by $20,525 and took additional deductions for purported commissions or discounts in the amount of $19,376.25, so that the final net income from operations that fiscal year as reported on the return was $5,651.34. The evidence also shows clearly that no commissions were paid on sales to stockyards, which were handled by petitioner himself, and yet petitioner throughout this period informed his bookkeeper to show commissions allowed on such sales. Petitioner did not report any sales of replacement parts in the fiscal years ended January 31, 1945, 1946 and 1947, although the evidence shows that such sales were made in this period. There is also evidence of specific omitted sales in the fiscal years ended*79 January 31, 1946 and 1950; in the latter fiscal year the petitioner received a payment for six machines from a customer in the amount of $17,023.27, which was not reported in petitioner's return for that fiscal year. In the fiscal year ended January 31, 1953 petitioner, in a schedule attached to his return, showed a net income from the operation of the Lessmann Manufacturing Company in the amount of $24,451.42. 5 But petitioner then claimed a deduction for net operating losses carried over from the prior fiscal years as follows Fiscal yearended Jan. 31Amount1950[43,540.66)1951(31,924.02)1952(1,131.57)We have seen, however, that there were unreported receipts in the fiscal years ended January 31, 1950, 1951 and 1952 in the respective amounts of $28,808.43, $27,240.86 and $32,563.46 which, together with other adjustments, considerably reduced the net operating losses for the fiscal*80 years ended January 31, 1950 and 1951 and completely eliminated them for the fiscal year ended January 31, 1956. 6 Petitioner impressed the Court as an intelligent businessman who was well aware of the extent of his machinery sales and that he was not reporting all of his sales by a wide margin. There was testimony from his bookkeeper to the effect that petitioner would select which checks from customers to deposit and which to hold back, and there was further evidence that petitioner instructed his bookkeeper to falsely show purported commissions paid on certain sales. This and other evidence is highly convincing that petitioner knew of his unreported sales during this period, including the fiscal years ended January 31, 1950, 1951 and 1952, when he showed operating losses on his returns for those years of $43,540.66, $31,924.02 and $1,131.57, and that he knew the operating loss was largely false which he carried forward from these years to deduct in the fiscal year ended January 31, 1953. By using this net operating loss deduction in the fiscal year ended January 31, 1953 petitioner completely wiped out the net income from operations for that fiscal year in the amount of $24,451.42. *81 We hold, on the basis of the entire record, that a part of the deficiency for each of the fiscal years ended January 31, 1945, 1946, 1947, 1948, 1949, 1952 and 1953 was due to fraud with intent to evade tax. We do not believe that respondent has met his burden to show fraud in the fiscal year ended January 31, 1954. Petitioner reported a net income for that fiscal year in the amount of $43,536.68. The deficiency determined by respondent for that fiscal year resulted from (1) respondent's disallowance (as personal expenditures) of expense deductions of $2,619.50, which we have sustained on petitioner's failure to meet his burden of proof; (2) the inclusion in income of certain dividend and interest income in the respective amounts of $787.50 and $1,295.62; and (3) a disallowance of a $775.19 loss from the sale of an automobile. There is absent in the record the requisite clear and convincing evidence to show fraud in this fiscal year, and we so hold. Our finding that the income*82 tax returns filed by petitioner for the fiscal years ended January 31, 1945 through 1949 were false and fraudulent with intent to evade tax disposes of the statute of limitations issue raised by the petitioner with respect to these years. Section 276(a). Respondent determined that petitioner was liable for additions to tax under section 294(d)(1)(A) for the fiscal years ended January 31, 1946, 1948, 1953 and 1954 for failure to file a timely declaration of estimated tax. Petitioner produced no evidence at the trial to show that such failure was due to reasonable cause, nor does he argue it on brief, and consequently we sustain respondent. For these same fiscal years respondent concedes that petitioner is not liable for additions to tax under section 294(d)(2). We also sustain respondent on the additions to tax determined by him under section 294(d)(2) for the fiscal years ended January 31, 1945, 1947, 1949 and 1952. Respondent is also sustained in his determination of an addition to tax under section 294(d)(1)(B) for the fiscal year ended January 31, 1952 for failure to pay an installment of estimated tax within the time prescribed by the statute. Petitioner introduced no evidence*83 to show that such failure was due to reasonable cause. See Chris J. Sherlock, 34 T.C. 522, 527, affd. 294 F. 2d 863. Decisions will be entered under Rule 50. Footnotes1. All section references will be to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩*. Includes cashier checks and drafts deposited in business and personal accounts.↩*. Sales figures do not appear on the returns in evidence for the fiscal years ended January 31, 1945-1947, but are derived from the accountant's working papers for those years which show the net profit or (loss) amounts as they appear in the income tax returns. ↩**. This represents gross sales of $207,373.17 minus discount in the amount of $8,560.90.↩2. As indicated earlier respondent's analysis showed undeposited receipts for the fiscal years ending January 31, 1950 and 1951 in the amounts of $28,808.43 and $27,240.86, respectively, but since respondent is accepting petitioner's cost figures and expenses (except for trivial amounts) no taxable income would be produced by the added receipts. Petitioner reported losses of $43,540.66 and $31,924.02 for those two fiscal years, so that the unreported receipts for these years merely reduced the reported losses.↩3. Although the fiscal years ended January 31, 1950 and 1951 are not in issue, it was necessary to ascertain the existence, if any, of unreported receipts in those years in order to determine the correctness of a net operating loss carry-forward from those fiscal years to the fiscal years ended January 31, 1952 and 1953 which are in issue.↩4. Apart from some brief, self-serving statements at the trial that the summer home and his residence were used for business purposes, petitioner made no serious effort at the trial to show that these expenditures were other than personal in nature, and on brief completely fails to make any argument on this issue.↩5. It is significant that petitioner began to use a full set of books late in 1951 and that in the next full operating year (fiscal year ending January 31, 1953) he showed his first operating profit from the Company since the fiscal year ended January 31, 1946.↩6. Respondent allowed petitioner a net operating loss deduction of about $1,000 for the fiscal year ended January 31, 1952, which used up any net operating losses carried forward from prior years.↩